**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 06-30008-01** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **ARCADIO VILLALOVOS** | * | **MAG. JUDGE KAREN HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a

motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 filed by defendant

Arcadio Villalovos, initially *pro se*, but presently represented by counsel [Doc. #100]. The

Government opposes Villalovos's motion. For reasons stated below, it is recommended that the

motion be **DENIED**.

## BACKGROUND

On February 28, 2006, Villalovos and Ricardo Gallegos ("Gallegos") were stopped on

Interstate 20 in West Monroe, Louisiana, by Officer Todd Newton of the West Monroe Police

Department after committing numerous traffic violations. Based on (1) conflicting stories

provided by Villalovos and Gallegos; (2) the presence of a masking agent; (3) nervous behavior;

(4) lack of knowledge as to the vehicle's registered owner's name; and (5) evasive answers to

questioning regarding the presence of drugs in the vehicle, Officer Newton obtained consent to

search the vehicle from both Villalovos and Gallegos, following which search he found thirty

kilograms of cocaine concealed in a hidden compartment under the spare tire compartment in the

rear cargo area of the vehicle.

On March 23, 2006, Villalovos and Gallegos were indicted on one count of conspiracy to

possess with intent to distribute five kilograms or more of a mixture containing a detectable amount of cocaine (Count 1) and one count of possession with intent to distribute five kilograms or more of cocaine (Count 2) [Doc. #1]. Walter M. Caldwell was appointed to represent Villalovos. Villalovos filed a motion to suppress on June 16, 2006, which was denied after an evidentiary hearing [Doc. #44, 46]. On June 20, 2006, Gallegos pled guilty to the conspiracy count [Doc. #38].[1]

Prior to trial, on September 7, 2006, Villalovos moved for the service of a subpoena on Gallegos [Doc. #52]; the motion was granted [Doc. #58]. The Court also granted Villalovos's unopposed motion in limine to exclude from use as evidence at trial any testimony concerning Villalovos's prior arrests or his affiliation with the Latin Kings criminal gang [Doc. #'s 50 and 62]. During the jury trial, after the Government rested, Caldwell notified the Court that while he had advised Villalovos not to testify, he needed to confer with Villalovos given the Court's ruling on the inadmissibility of certain defense testimony and documents, which request was granted. Villalovos did not testify at trial, nor did he call any witnesses. On September 19, 2006, the jury returned a verdict of guilty on both counts [Doc. # 76].

Prior to sentencing, Villalovos moved for a departure from the sentencing guidelines [Doc. #81]. At sentencing on January 16, 2007, Villalovos called Gallegos as witness. Gallegos testified that neither he nor Villalovos knew that there were thirty kilograms of cocaine in the

---

[1] In support of the guilty plea, DEA Special Agent Victor Zordan testified that thirty kilograms of cocaine were found hidden in the vehicle stopped on February 28, 2006, in which Gallegos was a passenger and which was driven by Villalovos. According to Agent Zordan, Villalovos and Gallegos gave conflicting versions of where they had been and where they were going. Gallegos agreed with Agent Zordan's testimony.

vehicle.[2]  The Court found that Villalovos did not meet his burden of establishing that he was entitled to a reduction in offense level as a minimal participant or minor participant in the drug conspiracy, and sentenced Villalovos to 163 months imprisonment on both counts, to run concurrently, and five years of supervised release.  The Fifth Circuit Court of Appeal affirmed Villalovos's conviction, finding that there was sufficient evidence from which the jury could infer that he knew cocaine was hidden in the vehicle [ Doc. #99].

On July 17, 2008, Villalovos filed the instant § 2255 motion alleging that (1) his counsel was ineffective in not allowing him to testify at trial that he did not give consent to search the vehicle nor did he know that there was cocaine in the vehicle and (2) his counsel was ineffective in depriving him of his right to compulsory process of favorable witnesses by not calling Gallegos to testify on his behalf at trial [Doc. #100].  Finding that an evidentiary hearing was warranted, the undersigned appointed Rebecca Hudsmith of the Federal Public Defender's Office to represent Villalovos.  The following facts were adduced at the evidentiary hearing.

Villalovos testified that he talked with Caldwell prior to the trial and during a recess in

---

[2] On cross-examination, Gallegos testified that he was going to get paid $1,000 to drive from Texas to Mississippi.  The AUSA questioned Gallegos regarding whether he had, in a previous interview at the jail with the AUSA and Agent Zordan, stated that he thought they may have been traveling to Alabama, to which Gallegos responded that he did not remember where he was going. The AUSA asked whether it was true that Gallegos told the police during the initial traffic stop that he was going to visit his aunt.  Gallegos stated that he did not remember if he told the police as much.  According to Gallegos, Villalovos told him that he was going to New Orleans for Mardi Gras when he left Mississippi.  Gallegos denied telling the AUSA and Agent Zordan during the aforementioned interview that he knew something illegal was going on with the initial car trip.

The Government subsequently called Agent Zordan, who testified that Gallegos told the police during the stop that he was going to visit his aunt and that he never mentioned anything about visiting his aunt during the interview at the jail.  Agent Zordan further testified that Gallegos told him during the interview that he did not know exactly what was in the car, but he knew something illegal was going on [Sent. Tr. pp. 4-14].

the trial regarding his right to testify. According to Villalovos, he told Caldwell that "no one was defending" him and therefore he wanted to testify that he had no knowledge of the drugs in the vehicle. (Hearing Transcript, p. 6) Villalovos testified that Caldwell advised him that it was not in his best interest to testify; therefore, in reliance on Caldwell's advice, he did not do so. Villalovos further testified that he told Caldwell that he wanted Gallegos to testify on his behalf, but that Caldwell did not call him to testify because Gallegos's testimony might be damaging. Villalovos stated that Gallegos would have testified at trial that Villalovos did not know that there were drugs in the vehicle. Villalovos did not know whether Caldwell ever interviewed Gallegos prior to trial or prior to the sentencing hearing at which Gallegos testified, but he stated that Caldwell did inform him that he spoke to Gallegos's attorney.

Attorney Lee Perkins testified that he was appointed to represent Gallegos. Perkins stated that he recalled Caldwell contacting him regarding the possibility of Gallegos testifying on Villalovos's behalf. According to Perkins, he informed Caldwell that Gallegos would not be a favorable witness for Villalovos. He stated that he did not recall if Caldwell requested that he be allowed to interview Gallegos prior to Villalovos's trial or prior to Gallegos's testifying at Villalovos's sentencing, but he did not think that Caldwell did so. Perkins acknowledged that the Government pointed out inconsistencies in Gallegos's testimony at Villalovos's sentencing. He stated that Gallegos was not a strong witness, and his testimony was inconsistent. However, he testified that Gallegos's testimony was consistent with regard to his contention that he did not know cocaine was in the vehicle.

Caldwell testified that prior to Villalovos's trial, he emailed Perkins to inquire as to whether he believed Gallegos would provide testimony helpful to Villalovos at the hearing on the

motion to suppress. According to Caldwell, it was his understanding as a result of that conversation that Perkins would advise Gallegos to avail himself of his Fifth Amendment privilege against self-incrimination if he was called to testify at the motion to suppress hearing. Caldwell's testimony is supported by an email sent by Caldwell to Perkins on July 9, 2006, in which Caldwell recounted that Perkins informed him that his client would plead the Fifth and that his testimony might be damaging to Villalovos if he did not testify. Gov. Ex. 1. Caldwell testified that his conversation with Perkins was part of the reason he did not call Gallegos to testify at trial. He stated that he continued to have conversations with Perkins, and based on those conversations, he was uncomfortable with calling Gallegos given the information he had been provided regarding the potential substance of Gallegos's testimony. Caldwell testified that another reason he was reluctant to call Gallegos was that all he could have testified to was that he did not know about the drugs in the car, but this would have been difficult given that Gallegos had already pled guilty at the time of Villalovos's trial. According to Caldwell, the only way Gallegos could have benefitted Villalovos would have been to testify that he knew the drugs were in the car and concealed that fact from Villalovos. Caldwell testified that he did not make the decision to not call Gallegos to testify alone; rather, Villalovos played a role in making the decision.

Caldwell stated that he believed that both he and the Government subpoenaed Gallegos to testify at trial, and that there was a serious question as to whose witness he was going to be. According to Caldwell, the Assistant United States Attorney handling the case told Caldwell he was not going to call Gallegos and that he needed to release the interpreter if Caldwell was not going to call him. Caldwell stated that it was his recollection that he then spoke with Villalovos

regarding whether he wanted to call Gallegos, and he and Villalovos decided that they would not do so. Regarding calling Gallegos to testify at the sentencing hearing, Caldwell stated that he could not remember specifically what his reasoning was at the time; however, it appeared to him that Gallegos's testimony could not hurt Villalovos at sentencing like it could have at trial since the issue of guilt had already been resolved. According to Caldwell, the issue he was trying to put before the Court at sentencing was Villalovos's role in the offense, *i.e.* whether he was a minor or minimal participant. Therefore, testified Caldwell, Gallegos was called to testify at sentencing for the purpose of minimizing Villalovos's culpability.

Caldwell stated that he did not prepare Gallegos for his testimony and that he basically only asked him whether Villalovos knew that there were drugs in the car. He further stated that Gallegos was a "horrible" witness, so much so that at one point during his testimony Perkins asked the Court for a recess so that he could confer with his client. Caldwell testified that he did not interview Gallegos prior to putting him on the stand because he was represented by counsel and he did not want to talk to him without Perkins' consent, and also because every conversation he had had with Perkins left him with a less than satisfactory feeling about what kind of witness Gallegos would be. Caldwell was asked about a handwritten note stating that the Government was not going to call Gallegos and wanted to "cut the interpreter loose" and that Caldwell spoke with Villalovos before and after trial. Gov. Ex. 3. Following this notation is the phrase "will call." *Id*. Caldwell did not recall writing this notation, but testified that it was his handwriting.

Caldwell testified that he recalled having numerous conversations, both prior to and during the trial, with Villalovos regarding the possibility of his testifying at trial. The Government introduced into evidence a set of handwritten notes taken by Caldwell on September

5, 2006, which state that he advised Villalovos not to testify a trial, Gov. Ex. 2; however, Caldwell testified that this was not the only time he conferred with Villalovos regarding his testifying. According to Caldwell, it was Villalovos's decision not to testify at trial; he maintained that he did nothing to prevent Villalovos from testifying and that despite advising his clients not to testify, he allows them to testify if they want to do so. Caldwell stated that in order to protect himself, he typically has the court advise his clients out of the presence of the jury of their right not to testify. When asked about the portion of the trial in which he indicated to the Court that he needed to consult with Villalovos regarding his intentions with regard to testifying, Caldwell stated that while he could not remember specifically when it occurred during the trial, he was certain that at some point during the trial he told Villalovos that if he wanted to testify, the time to do so had arrived, and that although his advice was that he not testify, it was up to him whether he wanted to do so. Caldwell testified that he did not recall any instance in which Villalovos insisted upon testifying.

Caldwell testified that there were strategic reasons for his advising Villalovos not to testify. He stated that his experience has been that despite defendants' belief that they can convince the jury that they are innocent, they usually end up "hanging themselves." However, Caldwell stated that he does sometimes call defendants to testify and that he has had some success doing so, but the circumstances are usually different that those in Villalovos's case. He then stated that there were other reasons he did not call him to testify, but that he did not know if it was appropriate to go into them.

Caldwell stated that his trial strategy in Villalovos's case was to rely on Villalovos's contention that he did not know the drugs were in the car. He testified that he tried to introduce a

videotape of Villalovos's post-arrest questioning during which Villalovos consistently denied having any knowledge of the drugs. According to Caldwell, his defense was based in part on the fact that the testimony of the police officers indicated that they were trying to convey that Villalovos had given contradictory statements when, in fact, he never admitted any knowledge that the drugs were in the vehicle. His testified that his strategy was also to rely on the fact that the cocaine was concealed in such a way that it would have been difficult for anyone other than a very well-trained law enforcement officer or the party that actually put the cocaine in the vehicle to know that it was there because it was concealed so well.

Caldwell testified that the videotape he had hoped to enter into evidence was excluded because the Government would not have been able to conduct cross-examination. When asked about a purchase record from an auto dealership in Illinois evincing the purchase of a used vehicle by Villalovos that Caldwell tried to enter into evidence and whether he initially tried to use Villalovos's sister for the purpose of demonstrating that Villalovos was engaged in the used car business, Caldwell was reluctant to respond due to attorney-client privilege. Caldwell testified that one concern he had with Villalovos's testifying was the sheer volume of times Villalovos has been arrested, although he only had possibly one misdemeanor conviction for possession. He stated that he would have objected had the Government tried to solicit any information in this regard, but his concern was that he could have opened the door with his questioning of Villalovos had he testified. According to Caldwell, Villalovos was never emphatic one way or the other about testifying; rather, his impression was that he probably had mixed feelings. He stated that he never prepared Villalovos for testifying because his impression, based on the conversations between the two, was that Villalovos was not going to

testify.

## LAW AND ANALYSIS

### I.     The Law of § 2255 Actions

Only cognizable under 28 U.S.C. § 2255 are jurisdictional and constitutional issues and in rare circumstances non-constitutional and non-jurisdictional errors, not raised on appeal, which could result in a "complete miscarriage of justice." *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998).  Collateral review is fundamentally different from and may not replace a direct appeal.  *United States v. Frady*, 456 U.S. 152, 165 (1982).  Thus, even if the issues are constitutional or jurisdictional, the defendant may be procedurally barred from raising them collaterally.  A defendant "may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (en banc).  "[T]he Supreme Court has recognized a narrow exception to the cause and prejudice test . . . this exception . . . is limited to 'extraordinary' cases involving 'manifest miscarriage[s] of justice' that would result in the continued incarceration of one actually innocent of the offense."  *Id.*

"[T]he general rule in this circuit is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations." *United States v. Higdon*, 832 F.2d 312, 313-14 (5th Cir. 1987).  Consequently, "the procedural bar does not apply to ineffective assistance of counsel" claims.  *United States v. Willis*, 273 F.3d 592, 598 n.7 (5th Cir. 2001); *see also United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992) ("Ineffective assistance of counsel . . . [may constitute] cause for a procedural default" (quoting

*Murray v. Carrier*, 477 U.S. 478, 488 (1986))).

## II.    Ineffective Assistance Of Counsel

Ineffective assistance of counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, the defendant must show both that (1) his attorney's performance was deficient; and (2) the "the deficient performance prejudiced the defense." *Id.* If the defendant does not make a sufficient showing as to one section of the test, the other prong need not be considered. *See Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).

The defendant has the burden of showing that the performance of counsel fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. An attorney's performance is measured against an "objective standard of reasonableness," *id.* at 688, "under prevailing professional norms." *Id.* In applying the first part of the *Strickland* test, courts should presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy. *See id.* at 689-90.

To satisfy the prejudice prong, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitled him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Accordingly, "[c]ounsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim." *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir.1990).

**A. Trial Counsel's intended admission of the videotape, which was ultimately excluded as inadmissible hearsay, did not render deficient counsel's overall trial strategy regarding Villalovos's knowledge of the drugs in the vehicle.**

Villalovos contends that Caldwell's trial strategy with regard to the issue of knowledge was fatally flawed as it relied heavily on the introduction of inadmissible hearsay evidence which he should reasonably have known would be excluded. As noted above, Caldwell intended to introduce a videotaped, post-arrest, purportedly exculpatory statement given by Villalovos; however, three days prior to trial, the Government filed a motion in limine seeking to exclude the videotape [Doc. #63], and Villalovos was ultimately prevented from introducing the videotape at trial. Villalovos contends that Caldwell should have known that the videotape would not be admissible, particularly since his opposition to the Government's motion in limine did not contain any authority in support of his position. Even assuming, however, that Caldwell should have realized that he would not be able to rely on the videotape at trial, the undersigned finds that this fact did not render his performance as a whole deficient.

Caldwell testified that his defense strategy was to demonstrate that Villalovos did not know that there were drugs in the car. While introduction of the videotape was a part of this strategy, it was not the entire trial strategy. For example, Caldwell testified that another facet of his strategy was to attempt to demonstrate that Villalovos had no knowledge of the drugs by relying on the fact that the cocaine was concealed in such a fashion that it would have been difficult for anyone other than a very well-trained law enforcement officer or the party that actually put it there to know that it was there. This portion of Caldwell's strategy is borne out by the trial transcript, which reveals that Caldwell questioned Officer Newton, Ouachita Parish Sheriff's Deputy Dale Chelette, who assisted Officer Newton during the traffic stop, and Agent

Zordan, who worked on the case and testified as an expert witness for the Government, extensively regarding the extent to which the hidden compartment was concealed and whether a layperson, as opposed to a well-trained law enforcement officer, would necessarily have knowledge of the compartment. Caldwell also questioned Agent Zordan, Detective Curtis Dewey, who took custody of the cocaine at the traffic stop and transported it to the crime lab, and Susan Rutledge, the forensic chemist who analyzed the cocaine, regarding whether there was any DNA or fingerprint evidence linking Villalovos to the hidden compartment or the cocaine.

Villalovos contends that the evidentiary value of Caldwell's strategy in this regard was greatly diminished by the fact that secret compartments are, by their very nature, hidden. However, Villalovos concedes that knowledge of the cocaine was the central contested issue at trial, and the undersigned finds that Caldwell's strategy of using the well-concealed nature of the hidden compartment and lack of physical evidence to attempt to demonstrate that Villalovos had no knowledge of the cocaine in the vehicle is in line with Fifth Circuit case law regarding what is necessary to prove the element of knowledge in drug conspiracy cases. As the Fifth Circuit has found, although a jury may typically infer that a defendant is aware of the presence of drugs in a vehicle if he or she exercises control over the vehicle, such is not the case when the drugs are hidden. *See United States v. Garcia-Gracia*, 2009 WL 837316, *3 (5th Cir. March 30, 2009) (citing *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995); *United States v. Gonzalez-Lira*, 936 F.2d 184, 192 (5th Cir. 1991)).[3] Rather, in hidden-compartment cases,

_____

[3] This is because of the possibility that "a defendant may be an unwitting carrier." *Id*. Moreover, the testimony revealed that the car was not registered to Villalovos, but rather to a Louis Marquez, and that Villalovos indicated during the stop that the car belonged to Gallegos, the passenger. *See e.g. United States v. Ortego Reyna*, 148 F.3d 540, 544 (5th Cir. 1998) (noting that the assumption that a third party may have concealed drugs in a vehicle in order to use the defendant

knowledge must be supported by additional circumstantial evidence, one aspect of which is "obvious or remarkable alterations to a vehicle."[4] *Garcia-Gracia*, 2009 WL 837316 at *3 (citing *Ortega Reyna*, 148 F.3d at 544); *see also United States v. Castilla*, 20 F.3d 600, 607 (5th Cir. 1994) (noting that the alterations made to the vehicle in order to allow the concealment of the drugs in the floor of the vehicle caused the back seats to sit higher than the front seats and, therefore, an average person would have realized the vehicle had been altered); *United States v. Gainer*, 169 Fed.Appx. 841, 843 (5th Cir. 2006) (substantial and obvious alterations made to the vehicle to accommodate the drugs); *United States v. Almanzar*, 176 F.3d 479, *10 (5th Cir. March 9, 1999) (noting the difficulty in accessing the hidden compartment and time taken to do so in finding that the alterations to the vehicle were not so obvious nor was the hidden compartment so readily accessible that an inference of knowledge was supported).

Therefore, although the part of Caldwell's trial strategy that relied the admission of the videotape may have been misguided, his overall strategy of attempting to demonstrate that Villalovos had no knowledge of the drugs in the vehicle by emphasizing the well-hidden nature of the compartment in an attempt to evince Villalovos's lack of knowledge, and his utilization of cross-examination of the Government's witnesses to implement such strategy, was entirely reasonable and in accordance with the law in this circuit. Accordingly, the undersigned finds that

---

as an unwitting carrier is heightened when the vehicle is on loan to the defendant or has only been in his possession for a short period of time).

[4] The remaining factors are (1) nervousness; (2) absence of nervousness, *i.e.*, a cool and calm demeanor; (3) failure to make eye contact; (4) refusal or reluctance to answer questions; (5) lack of surprise when contraband is discovered; (6) inconsistent statements; (7) implausible explanations; (8) possession of large amounts of cash. *United States v. Sosa-Mendoza*, 293 Fed.Appx. 290, 292-93 (5th Cir. 2008) (citation omitted).

Villalovos has failed to demonstrate that Caldwell's performance in this regard was deficient, and it recommended that his motion on this ground be **DENIED**.

### B. Trial Counsel was not Ineffective in Failing to Call Co-defendant Gallegos as a Witness During Villalovos's Trial.

Villalovos next contends that Caldwell was ineffective in failing to call Gallegos as a witness at trial or to even interview him prior to trial. According to Villalovos, because Caldwell had no firsthand knowledge of what Gallegos's testimony would be, but rather relied only on Perkins' non-fact-specific representations, he was not in a position to advise Villalovos of the risks associated with calling Gallegos to testify at trial.

The Fifth Circuit has held that "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy," *Wilkerson v. Cain*, 233 F.3d 886, 892-93 (5th Cir. 2000), and also because "allegations of what a witness would have testified are largely speculative," *United States v. Cockrell*, 720 at 1427. Thus, the Fifth Circuit "has viewed with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant." *Id*. In order to prevail on a claim regarding an uncalled witness, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Bray v. Quarterman*, 265 Fed.Appx. 296, 298 (5th Cir. 2008) (citation omitted). "The petitioner must also show prejudice, *i.e.*, a 'reasonable probability' that the uncalled witnesses would have made [a] difference to the result.'" *Id*. (citation and quotations omitted).

In the case *sub judice*, the undersigned finds that Caldwell's decision not to call Gallegos

as a witness at Villalovos's trial was within the bounds of reasonable trial strategy. Villalovos correctly notes that "at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985) (citation omitted). According to Caldwell, he never attempted to interview Gallegos because (1) Perkins had repeatedly indicated that Gallegos would not be a favorable witness for Villalovos and (2) Gallegos had previously pled guilty to the same indictment as Villalovos. Although Villalovos contends that these facts did not absolve Caldwell of his responsibility to interview Gallegos himself, the undersigned does not find Caldwell's performance in this regard to have been deficient.

First, this was not a situation in which Caldwell simply failed to make any attempt to interview Gallegos for no discernable reason; rather, he had been told on more than one occasion by Perkins that Gallegos would not be favorable witness for Villalovos and/or that Perkins would advise him to plead the Fifth if he were called to testify. It was not unreasonable for Caldwell to assume that Gallegos's counsel was familiar with what his testimony would potentially be or to rely on counsel's opinion that Gallegos's testimony could be damaging to Villalovos. Moreover, irrespective of any reliance on the representations of Perkins, Caldwell stated that one reason he did not call Gallegos as a witness was because he had previously pled guilty to the same charge for which Villalovos was on trial. Villalovos argues that in so doing, Gallegos only acknowledged the most basic admission of guilt and did not specifically admit to actual knowledge of the drugs seized.[5] However, even if Gallegos did not specifically admit to

---

[5] When questioned by the Government regarding his guilty plea, Gallegos stated that he pled guilty because the Government was going to give him reduced time [*See* Sent. Tr. P.9].

knowledge of the drugs, such an admission is implicit in the fact that he pled guilty to possession with the intent to distribute five kilograms or more of cocaine. In any event, it was certainly reasonable for Caldwell to assume that the fact that Gallegos had pled guilty would have compromised his value as a witness given that the Government could have used such guilty plea to impeach his testimony. *See United States v. Ramos-Cardenas*, 524 F.3d 600, 610 (5th Cir. 2008) (noting that the credibility of a co-defendant who testifies may be impeached by evidence of the co-defendant's prior guilty plea); *United States v. Black*, 685 F.2d 132, 135 (5th Cir. 1982) ("Impeachment is a sufficient and proper reason for admitting evidence of a witness' guilty plea."). In addition, the only way that Gallegos could have convincingly testified to actual knowledge that Villalovos was unaware of the presence of the drugs would have been to admit that he himself was aware of them, and, based on his testimony at the sentencing hearing, he would not have done so. Instead, when he testified at the sentencing hearing, Gallegos claimed that neither he nor Villalovos was aware of the drugs. Obviously, if Gallegos was not aware of the presence of the drugs, he had no way of knowing whether Villalovos was aware of them or not. Therefore, under the circumstances of this case, the undersigned finds that Caldwell's performance in failing to call Gallegos as a witness or to interview him in person did not constitute deficient performance.

Even assuming, however, that Caldwell's failure to call Gallegos as a witness was unreasonable, Villalovos has not demonstrated prejudice resulting from such failure. First, given Caldwell's recollection that Perkins would have advised his client to plead the Fifth if he were called to testify at the motion to suppress hearing, it is speculative at best that Gallegos would have in fact testified that he and Villalovos were unaware of the drugs in the vehicle, especially

given that at the time of the trial Gallegos had not yet been sentenced. Second, as noted above, Gallegos testified at Villalovos's sentencing and was subjected to rigorous cross-examination by the Government regarding alleged inconsistencies between his testimony and his statements during an previous interview with the AUSA,[6] following which the Government called Agent Zordan whose testimony contradicted Gallegos's [*See* Sent. Tr. pp. 4-17] in numerous respects. After hearing such testimony, the District Judge specifically noted that Gallegos's testimony was inconsistent, uncredible, and unpersuasive [Sent. Tr. p.27]. Although such a finding is not entirely indicative of what the jury in Villalovos's trial would have found, it certainly casts doubt on Villalovos's assertion that the result of his trial would have been different had Gallegos testified. Finally, the Fifth Circuit found on direct appeal that there was more than sufficient evidence to support an inference by the jury that Villalovos knew that the vehicle contained cocaine [Doc. #99]. Therefore, there is simply not a sufficient probability that the result of Villalovos's trial would have been different had Gallegos testified. Accordingly, as Villalovos has not demonstrated that Caldwell's performance was objectively deficient or that he suffered any prejudice, it is recommended that his motion on this ground be **DENIED**.

**C. Trial counsel did not render ineffective assistance of counsel in failing to implement the part of his trial strategy related to showing that Villalovos had legitimate reasons for being in Louisiana.**

Villalovos raises the argument for the first time following the evidentiary hearing that Caldwell was ineffective in failing to implement his strategy to call Villalovos's sister to testify that Villalovos has legitimate reasons for being in Louisiana and, in connection with such testimony, introduce a purchase record purportedly showing that Villalovos purchased a used

---

[6]

vehicle in Illinois in February of 2006. The testimony and documentation was intended to establish that Villalovos was engaged in the used car business, giving him a reason for being in Texas, from where he indicated he was traveling at the time of the traffic stop, and subsequently for traveling through Louisiana at the time of his arrest.[7]

However, the trial transcript reveals that there was a discussion at trial regarding the potential testimony of Villalovos's sister, with Caldwell informing the Court that he had learned that morning that the sister did not have sufficient personal knowledge of Villalovos having engaged in the used car business [Tr. Trans. p. 100]. Anticipating a hearsay objection from the Government, and after the Government confirmed that it would in fact object on such grounds, Caldwell stated that he anticipated that the sister would have personal knowledge only that she and Villalovos had attended Mardi Gras in the past. *Id*. at 100. Because the sister ultimately did not testify, the Government objected to the admission of the purchase record on the ground of relevance, and Caldwell was granted a recess in order to confer with his client regarding whether he would testify. *Id*. at 102. Following such recess, Villalovos rested his case without testifying.

To the extent that Villalovos argues that Caldwell was ineffective in failing to call the sister as a witness or to introduce the purchase record, the undersigned finds that Caldwell did not render ineffective assistance of counsel. Having learned that the sister lacked personal knowledge of whether Villalovos was engaged in the used car business, Caldwell was certainly justified in not calling her as at witness in that her testimony would have been subject to a

---

[7] There was very little testimony on this subject at the evidentiary hearing. Villalovos's counsel questioned Caldwell regarding his attempt to use this evidence, but Caldwell was concerned that the answer would require him to disclose conversations he had with his client about his defense [Doc. #112, p. 35].

hearsay objection and, without the sister's testimony, the Court found the document to be irrelevant. Villalovos states that "because of his lack of diligent preparation, Mr. Caldwell was unable to present testimony regarding Mr. Villalovos's used car business and reasons for being in Louisiana." However, Villalovos does not indicate what Caldwell could have done to implement his trial strategy in this regard. The fact that the sister ultimately was not able to testify and that Caldwell was not able to rely on the document does not indicate that counsel's performance was deficient. Therefore, it is recommended that Villalovos's motion on this ground be **DENIED**. To the extent that Villalovos is arguing that Caldwell should have put him on the stand to testify himself on these points, this argument is discussed below.

### D. Trial Counsel Did Not Render Ineffective Assistance of Counsel by Advising Villalovos Not to Testify at Trial.

Villalovos contends that Caldwell rendered ineffective assistance of counsel in advising him not to testify on his own behalf at trial. He contends that rather than implementing his trial strategy by relying on (1) the inadmissible videotape and (2) what he thought the sister's testimony would be regarding Villalovos's alleged engagement in the used car business and the related document, Caldwell should have implemented the admissible parts of his trial strategy, namely calling Gallegos and Villalovos to testify at trial. As noted above, however, the undersigned found no deficiency in Caldwell's overall trial strategy of demonstrating that Villalovos had no knowledge of the cocaine in the vehicle, two ultimately unsuccessful parts of which were the attempted admission of the videotape and the sister's testimony and related document, or in Caldwell's decision to not call Gallegos as a witness at trial. With regard to Villalovos's not testifying at trial, he contends that had he done so, he would have testified that

(1) he did not know he was transporting cocaine or that there was a secret compartment in the vehicle containing cocaine; (2) he did not give the arresting authorities permission to search the vehicle; and (3) he had an innocent explanation for being in Louisiana.[8] Villalovos states that had he testified, the jury would have had an opportunity to assess his demeanor and he would have been able to provide an alternate conclusion as to why he was in Louisiana with thirty kilograms of cocaine in the vehicle he was driving.

"A criminal defendant's right to testify is well established." *United States v. Mullins*, , 452 (5th Cir. 2002) (citing *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir.2001)). "Only the defendant may waive this right, not his counsel, and it must be knowing and voluntary." *Id.* (citing *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir.1997)). The Fifth Circuit has held that "where the defendant contends that his counsel interfered with his right to testify, the 'appropriate vehicle for such claims is a claim of ineffective assistance of counsel.'" *Id.* (quoting *Sayre*, 238 F.3d at 634). Therefore, Villalovos must demonstrate both that Caldwell's performance was deficient and that he was prejudiced thereby.

With regard to whether Caldwell's performance was deficient, the Fifth Circuit has "examined counsel's decision on whether a defendant will testify as part of counsel's trial strategy" and has cautioned that "the decision whether to put a Defendant on the stand is a 'judgment call' which should not easily be condemned with the benefit of hindsight." *Id.* (citations omitted). However, "[a]t the same time it cannot be permissible trial strategy, regardless of its merits otherwise, for counsel to override the ultimate decision of a defendant to

---

[8] It is somewhat unclear whether Villalovos contends that he would have testified that his reason for being in Louisiana was related to his engagement in the used car business or the fact that he was going to Mardi Gras.

testify contrary to his advice." *Id.* (citations omitted). Thus, "[i]t cannot be reasonable trial strategy for an attorney not to honor his client's decision to exercise his constitutional right to testify, not because the advice not to take the stand is unsound, but because counsel must in the end accede if the client will not abide by the advice." *Mullins*, 315 F.3d at 454. In order to demonstrate prejudice, Villalovos must show that there was "a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt" and that the errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 457.

It appears undisputed in this case that it was Villalovos who made the decision that he would not testify based on Caldwell's advice; therefore, the only issue to be resolved is whether Caldwell's advice that Villalovos not testify was sound trial strategy and, if not, whether Villalovos was prejudiced thereby. Villalovos contends that Caldwell did not offer a single, viable reason for not advising Villalovos to testify based on the following: (1) Caldwell's concern about Villalovos's prior arrest record was unfounded given that mere arrests are generally not admissible to impeach witnesses and the Government had given no notice of an intention to introduce evidence pursuant to Federal Rule of Civil Procedure 404(b); (2) Caldwell could have avoided opening the door to such arrests by preparing Villalovos for his testimony and using well-formulated questions; and (3) Caldwell's generalized concern that most defendants who testify end up "hanging themselves" is not based on any empirical or demonstrable evidence.

Villalovos is correct that Caldwell could possibly have avoided opening the door by adequately preparing him to testify and by limiting the nature of his questions; however, such an

outcome was by no means certain. Even with the best of preparation, the risk of "opening the door" remained. *See Smith v. Great West Cas. Co.*, 2007 WL 4114342, * (E.D.La. Nov. 15, 2007) (granting a motion in limine to exclude evidence of prior convictions or bad acts but noting that if the proponent of the motion did or said something during trial to open the door, the evidence would potentially become admissible**)**. Caldwell indicated at the hearing that there were other reasons that he advised Villalovos not to testify, but he did not provide these reasons, citing concerns regarding attorney/client privilege. Villalovos did not contradict Caldwell's claim, or deny the existence of additional reasons why Caldwell would have advised against testifying. In addition, as noted above, Caldwell was able to make the argument that Villalovos had no knowledge of the cocaine in the vehicle through cross-examination of the Government's witnesses.

The undersigned finds that Caldwell's advice to his client not to testify at trial was well within the broad range of competent representation. In addition, even if Caldwell had performed deficiently by advising Villalovos not to testify on his own behalf, Villalovos cannot demonstrate prejudice. As noted above, Villalovos appealed the issue of whether there was sufficient evidence to prove that he knew that there was cocaine secreted in a hidden compartment in the vehicle, and the Fifth Circuit found that the evidence was more than sufficient for the jury to infer that Villalovos knew that the vehicle contained cocaine. The court based this finding on (1) Villalovos's nervous behavior during his interaction with law enforcement; (2) the substantial modifications made to the vehicle; and (3) the large amount of cocaine involved[9] [Doc. #99].

_____

[9] The testimony indicated that the cocaine found in the vehicle was worth approximately $600,000.

Therefore, given the Government's strong circumstantial case against Villalovos, even if he had testified that he had no knowledge that there were drugs in the vehicle and that he had a legitimate reason for being in Louisiana, there is simply not a sufficient probability that the jury would have returned verdict of not guilty. The undersigned also notes that Caldwell's notes from his meeting with Villalovos on September 5, 2006, state that Villalovos could not remember the name of any person who could explain why he was in Texas or the name or address of an auto dealership in Texas [Gov. Ex. 2]. Therefore, based on the information Villalovos himself gave to Caldwell, it is very doubtful that any testimony from Villalovos regarding his reasons for being in Texas or Louisiana or his purported engagement in the used car business would have been convincing. Accordingly, it is recommended that Villalovos's motion on this ground be **DENIED**.

**CONCLUSION**

For these reasons, it is **RECOMMENDED** that Villalovos's motion to vacate, set aside, or correct sentence [Docs. #100] be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS**

**REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE**

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 2nd day of July, 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE